IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

MICHAEL WALKER,                    )
                                   )
        Plaintiff,                 )
                                   )
    v.                             )    Case No. 1:20-cv-1007-ECM-SMD
                                   )
GREGORY TODD DORRIETY, *et al*.    )
                                   )
        Defendants.                )
                                   )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

### I.   Introduction

Pro se plaintiff Michael Walker ("Walker') was arrested, booked, charged, and convicted of public intoxication.  He now brings 42 U.S.C. § 1983 and analogous state-law claims against the arresting officers in their individual capacities for false arrest, excessive force, and deliberate indifference to serious medical needs.  Compl. (Doc. 1).  Pending before the Court is the  officers' motion for summary judgment raising qualified immunity and state-agent immunity. Mot. (Doc. 48).  Walker has failed to overcome the officers' immunity defenses and the undersigned RECOMMENDS that their motion be GRANTED, and JUDGMENT be entered in their favor.

### II.  Parties and Claims

Walker brings claims against the following five City of Ozark police officers in their individual capacities: Corporal Greg Dorriety, Patrol Officer James Sanders, Investigator

Travis Cauthen, Corporal Jerome Niles, and Investigator Tyler Johnson.[1]  Compl. (Doc. 1) ¶¶ 2-6.  Counts I through IV only name Cpl. Dorriety and Officer Sanders as defendants. Count V is brought against all five defendants.  *Id.* at ¶¶ 56-57.

Count I is a § 1983 claim for illegal seizure that alleges that Cpl. Dorriety and Officer Sanders seized Walker without probable cause or reasonable suspicion in violation of the Fourth and Fourteenth Amendments.  Compl. (Doc. 1) ¶¶ 44-46.  Count II[2] is a § 1983 claim for excessive force against Officer Sanders and Cpl. Dorriety.  *Id.* at ¶¶ 47-49. Count III and IV are analogous state-law claims for false arrest/false imprisonment and assault and battery/excessive force against Officer Sanders and Cpl. Dorriety. *Id.* at ¶¶ 50-52; 53-55.  Count V is a § 1983 claim for deliberate indifference to serious medical needs in violation of the Fourteenth Amendment against all five defendants.  *Id.* at ¶¶ 56-57.

### III.   Procedural Posture

Defendants argue that Walker's opposition (Doc. 52) should not be considered because it was untimely and because his statement was not properly sworn.  Reply (Doc. 53).  Walker was represented by counsel when he filed his complaint  (Doc. 1), but his counsel subsequently withdrew, and he is now pro se.  (Docs. 23, 24, & 27).  Defendants filed their motion for summary judgment on June 14, 2022.  (Docs. 48 & 49).  The undersigned ordered Walker to file a written response on or before July 5, 2022.  Order

---

[1] Investigator Johnson is currently a Dale County Sheriff's deputy and is no longer employed by the City of Ozark.  Johnson Decl. (Doc. 49-7) ¶ 2.

[2] Count II is mislabeled as Count III in the complaint.  Compl. (Doc. 1) at 6.

(Doc. 50).  The order specifically warns Walker that "[a]ny documents or evidence filed after the applicable deadline will not be considered by the Court absent a motion demonstrating good cause."  *Id.* at 1.  Walker filed his opposition on July 15, 2022, ten days after the deadline, and he did not seek an enlargement of time.  (Doc. 52).  However, the certified mail receipt shows that the order was not served on Walker until July 11, 2022, six days after the deadline expired.  (Doc. 51).  Under these circumstances, the undersigned will not treat Walker's opposition as untimely.

Pursuant to *Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985) and its progeny, the undersigned notified Walker that to raise a genuine factual dispute, he must cite to particular "materials in the record including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]"  Order (Doc. 50) at 2 (quoting FED. R. CIV. P. 56(c)(1)(A)).  The order specifically warned Walker that he "cannot rely on his unsworn pleadings, but instead must oppose the Motion by filing sworn affidavits, declarations, depositions, or other evidentiary materials to demonstrate that there is a genuine dispute for trial in this case."  *Id.*  The order further explained that an affidavit is a sworn statement in writing made under oath or on affirmation before a notary public or other authorized officer and that a declaration is a statement made under penalty of perjury that meets the requirements of 28 U.S.C. § 1746.  *Id.* at n. 3.

3

Walker's opposition consists of three typed pages mixing argument and factual statements and two stills from police vehicle dash cameras.  Resp. (Doc. 52).  Walker signed and dated each page at the bottom.  The first page has a notary public's seal in the upper right hand corner, but there is no indication that the notary put Walker under oath, and he has not sworn to the truth of his statement's contents under penalty of perjury.  *See* 28 U.S.C. § 1746.  This document is not an affidavit or declaration that may be used to raise a factual issue precluding summary judgment.  "[M]erely notarizing [a] signature does not transform [a] document into an affidavit that may be used for summary judgment purposes."  *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306-1307 (5th Cir. 1988) (*citing Flowers v. Abex Corp.* 580 F. Supp. 1230, 1233 n. 2 (N.D. Ill. 1984)).  *See also Latney v. Parker*, 2017 WL 7794573, at *2 (E.D. Va. 2017) (holding same).  The Eleventh Circuit recently adopted the Fifth Circuit's guidance in *Nissho-Iwai American Corporation* and held that a pro se prisoner's unsworn affidavit cannot be considered on summary judgment.  *Roy v. Ivy*, 53 F.4th 1338, 1350 (11th Cir. 2022).  Walker's unsworn statement here cannot be considered when ruling on Defendants' motion for summary judgment, and any factual assertions in Walker's opposition (Doc. 52) will be disregarded for purposes of this motion.  *Id*.; *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n. 26 (11th Cir. 2003).

## IV.   Legal Standard

### Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(a).  When the non-moving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to "make a showing sufficient to establish the existence of an element essential to [its] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The legal elements of the plaintiff's claim dictate which facts are material and which are irrelevant. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  A fact is not material if a dispute over that fact will not affect the outcome of the case under the governing law. *Id.* "If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law." *Celotex*, 477 U.S. at 331 (White, J., concurring).

The court must view the proffered evidence in the light most favorable to the nonmovant and resolve all reasonable doubts about the facts in the nonmovant's favor. *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234,1243 (11th Cir. 2001).  However, a mere scintilla of evidence in support of a claim is insufficient; the nonmovant must produce sufficient evidence to enable a jury to rule in his favor. *Id.*  The Eleventh Circuit explains that "[s]imply put, the plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.*  (internal quotes and citations omitted).

Although factual inferences must be drawn in favor of the non-moving party and pro se pleadings are entitled to a liberal interpretation, a litigant's pro se status does not allow him to escape the essential burden on summary judgment of establishing a genuine

dispute concerning a material fact. *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). On summary judgment, a pro se plaintiff must still adduce evidence sufficient to establish the essential elements of his claims. *Id.*

### V.  Undisputed Facts

On January 7, 2020, at 10:52 AM, the Ozark-Dale County E-911 central dispatch center issued a call for a suspicious mentally disturbed man in the area of Fair Avenue in Ozark. (Docs. 49-4, 49-5, 49-6, 49-7, 49-8) ¶ 5.  The dispatcher gave a physical description of the man and reported that he was yelling and putting "voodoo curses" on residents.  *Id.* As officers responded, the dispatcher reported that the 911 caller was following the subject in a pickup as he walked down the street, and that the subject was trying to crawl into the back of the caller's pickup. *Id.* ¶ 6.

At 10:57 AM, Ozark Police Sgt. Jimmy Owens and Officer Sanders arrived in the area in separate vehicles.  (Doc. 49-4) ¶ 7.  Sergeant Owens arrived and saw the subject moving through the back yards of some homes and reported this over the radio.  He also reported that the subject was very vocal.  (Docs. 49-4; 49-5) ¶ 7.  Officer Sanders located the subject standing in a fenced-in back yard behind a house. (Doc. 49-4) ¶¶ 9-11.  The subject was Walker, and the house was not his.  *Id.* ¶¶ 9, 12, 16.  Officer Sanders and Sgt. Owens remained outside the fence, and they ordered Walker at least thirteen times to come back over the fence.  *Id.* ¶¶ 12, 14, 17. Walker refused to leave the back yard.  *Id.* ¶ 17.  He was ranting nonsensically in a loud voice about God and being the second Messiah.  *Id.* ¶¶ 11, 14.  He also made statements about drugs and claimed that he had just shot five SWAT

team members.  *Id.* ¶¶ 12, 13.  None of Walker's statements made any sense, and Officer Sanders believed that he was delusional. *Id.* ¶¶ 13, 14.

At 11:05 AM, Cpl. Dorriety, Inv. Cauthen, Cpl. Niles, and Inv. Johnson arrived at the scene.  *Id.* ¶ 18; (Doc. 49-5, 49-6, 49-7, 49-8) ¶ 10.  Sergeant Owens and the newly arrived officers all climbed over the fence and entered the back yard.  (Doc. 49-4) ¶¶ 18-19; (Doc. 49-5) ¶ 12.  Officer Sanders was unable to climb the fence and remained outside the yard.  (Doc. 49-4) ¶ 19.  Corporal Dorriety recognized Walker from prior calls and knew he was a drug abuser and that the yard was not his.  (Docs. 49-5,) ¶ 10.  As Cpl. Dorriety entered the back yard, Walker advanced toward him holding a ladder he had picked up in the yard.  (Doc. 49-4) ¶ 18; (Doc. 49-5) ¶¶ 10, 13.  Walker held the ladder horizontally in front of his body at waist level, and Cpl. Dorriety believed that he intended to use it as a weapon against him.  (Doc. 49-5) ¶ 13.  *Id.*  He ordered Walker to put his hands behind his back, and when he failed to comply, Cpl. Dorriety fired his TASER at him in probe mode.[3]  (Doc. 49-5) ¶ 13.  Walker turned his body sideways and dropped the ladder when the TASER fired, and only one probe struck him.  (Doc. 49-5) ¶ 14.  Seeing

---

[3] TASERs work by shooting two small metal probes that release electricity into the body causing neuromuscular incapacitation.  When in probe mode, a Taser fires two small, barbed darts roughly the size of a fishhook that are designed to latch onto a target's skin or clothes.  The probes remain connected to the TASER gun by thin insulated copper wires.  The probes must both connect with the target and be at least four inches apart to complete the circuit and channel an electric pulse into the target's body.  TASERs will not work when only one probe makes contact.   Larry Greenemeier, *TASER seeks to Zap Safety Concerns*, Scientific American, www.scientificamerican.com/article/taser-electric-shock-zap-law-Canada (last visited January 26, 2023).

that the TASER was ineffective, Cpl. Dorriety holstered it and told Inv. Johnson to grab Walker from behind. (Doc. 49-5) ¶ 14.

Investigator Johnson wrapped his arms around Walker from behind and took him to the ground. (Doc. 49-4) ¶ 22; (Doc. 49-5) ¶ 15. Once on the ground, Walker held his hands under his body and kicked his feet. *Id.* Corporal Dorriety kneeled on Walker's left side, Cpl. Niles kneeled on his right side, and Inv. Cauthen kneeled at his head. *Id.* Walker resisted handcuffing by continuing to tense his hands under his body and kicking with his legs. *Id.* To stop Walker from kicking, Sgt. Owens crossed Walker's legs and pressed his feet toward his buttocks. *Id.* This technique is used by law enforcement officers to control a combative subject's legs to prevent them from kicking. (Doc. 49-4) ¶ 25. Corporals Dorriety and Niles quickly overpowered Walker and brought his hands behind his back, and Cpl. Dorriety handcuffed him. (Doc. 49-5) ¶ 15. Once Walker was handcuffed, all use of force against him stopped immediately. (Doc. 49-5) ¶ 15. It took approximately thirty seconds from the time when the officers entered the yard until Walker was handcuffed. (Doc. 49-5) ¶ 16.

At 11:06 AM, Cpl. Dorriety radioed dispatch and requested an ambulance because of his TASER deployment. (Doc. 49-5) ¶ 17. Corporal Dorriety and Investigator Johnson escorted Walker from behind the house to the street and sat him on the curb to wait for the ambulance. (Doc. 49-5) ¶ 19. Walker claimed that his leg was injured, but there was no obvious bleeding or deformity visible on his leg. (Doc. 49-4) ¶ 25; (Docs. 49-5, 49-6, 49-7, 49-8) ¶ 18. While waiting, Walker made more incoherent statements about drugs. (Doc.

49-5) ¶ 20.  Both Cpl. Dorriety and Officer Sanders believed that Walker was delusional because he was high on drugs.  (Doc. 49-4) ¶ 29; (Doc 49-5) ¶ 22.  The ambulance arrived at 11:11 AM, and the medics evaluated Walker.  (Doc. 49-5) ¶ 21.  While being evaluated, Walker claimed to have been shot by high-powered rifles.  (Doc. 49-5) ¶ 21.  The medics completed their evaluation and left. (Doc. 49-5) ¶ 22.  They did not inform the police that Walker was injured or required hospital care.  (Doc. 49-5) ¶ 22.

After the medics completed their evaluation, Cpl. Dorriety and Officer Sanders escorted Walker to Officer Sanders' patrol vehicle (Doc. 49-5) ¶ 23, and Officer Sanders transported him to the Dale County Jail.   (Doc. 49-4) ¶ 36.  The jail provides medical care for inmates.  (Doc. 49-4) ¶ 29.  Cpl. Niles interviewed the 911 caller who reported that he discovered Walker at his sister's home "raising hell," and that Walker cursed him and threatened to kill him. (Docs. 49-5, 49-6) ¶ 25.   During transport Walker made more rambling statements about drugs, being shot, and killing people including police officers. (Doc. 49-4) ¶ 37.  Officer Sanders arrived at the jail at 11:32 AM and booked Walker on a charge of public intoxication. (Doc. 49-4) ¶ 39.

Officer Sanders swore out a complaint charging Walker with public intoxication in the Ozark Municipal Court on January 24, 2020.  Complaint, *Municipality of Ozark v. Michael Jay Walker*, MC20-12 (Ozark Municipal Ct.).[4]  Walker appeared for trial before

---

[4] The undersigned takes judicial notice of these state court records pursuant to FED. R. EVID. 201.  The records of Walker's municipal court case including the arrest report, complaint, adjudication order, and notice of appeal are found in the certified record on appeal in *Alabama v. Walker*, Case No. CC-2020-000181.00 (Dale County Cir. Ct.) (Doc. 1), which is available on the official alacourt.com website.  *See*

Judge Fred R. Steagall on July 28, 2020, and was found guilty and sentenced to a $160 fine, $240 court costs, and 30 days suspended. *Ozark v. Walker*, MC20-12 (Ozark Municipal Ct.). Walker appealed to the Circuit Court of Dale County on August 10, 2020, requesting a de novo jury trial. *Alabama v. Walker*, Case No. CC-2020-000181.00 (Dale County Cir. Ct.) Notice of Appeal (Doc. 1). Walker failed to appear for a docket call on August 31, 2022, and Circuit Judge Kimberly A. Clark dismissed his appeal and remanded to the Municipal Court for disposition. *Id.* (Docs. 53 & 55) Orders.

## VI.   Discussion

### A.   42 U.S.C. § 1983 Claims

#### 1.   Qualified Immunity

Ozark Police officers Dorriety, Sanders, Cauthen, Niles, and Johnson assert that they are entitled to qualified immunity on all of Walker's § 1983 constitutional tort claims. Defs' Mot. for Summary Judgment (Doc. 48). Qualified immunity completely protects government officials sued in their individual capacities unless their conduct violates "clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019) (internal quotes and citation omitted). The Eleventh Circuit explains that "[u]nless the government official's act is so obviously wrong, in light of pre-existing law, that only a plainly incompetent official or one who was knowingly violating the law would have committed

*Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1041 n. 18 (11th Cir. 2014) (taking judicial notice of state court records found in online judicial records system).

the act, the official is entitled to qualified immunity." *Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1328 (2003).  Qualified Immunity is a powerful doctrine that provides a true "*immunity from suit* rather than a mere defense to liability[.]" *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis original).

The purpose of qualified immunity is to allow government officials to carry out their duties without fear of personal liability or harassing litigation. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  The doctrine "prevents public officials from being intimidated—by the threat of lawsuits that jeopardize the official and her family's welfare personally—from doing their jobs." *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013).  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation[.]" *Mitchell*, 472 U.S. at 526.  Therefore, the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)*.  See also Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002) ("[b]ecause of the purpose served by the doctrine of qualified immunity, a valid defense based upon it must be recognized as soon as possible, preferably at the motion to dismiss or summary judgment stage").

"The applicability of qualified immunity is a question of law to be decided by the court."  *Willingham v. Loughman*, 261 F.3d 1178, 1184 (11th Cir. 2001).  To receive qualified immunity, a government official must first show that he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts occurred. *Hinson*, 927 F.3d at 116; *Maddox*, 727 F.3d at 1120.  The burden of proof then shifts to

plaintiff to show that qualified immunity is not appropriate.  *Id.*  Challenged actions are within the scope of an official's discretionary authority when they were (1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority.  *Hinson*, 927 F.3d at 116; *Gray v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006).  In applying this test "'a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties.'"  *Id.* (quoting *Harbert Int'l v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998)).

Here, it is uncontested that the defendant police officers were on duty responding to an E-911 dispatch when they allegedly violated Walker's constitutional rights. Therefore, they have established that they were acting within the scope of their discretionary authority and are entitled to qualified immunity.  *Hinson*, 927 F.3d at 116 ("Defendant Officers readily satisfy [the discretionary authority] requirement, as they undertook all of the challenged actions while on duty as police officers conducting arrests and investigative functions").  Walker has the burden of overcoming their immunity.  *Id.* To do so, he must adduce evidence that, when viewed in the light most favorable to him, shows (1) that the defendant officers violated his constitutional rights, and (2) that it was clearly established at the time of the incident that the actions of the defendant officers were unconstitutional.  *Id.*; *Maddox*, 727 F.3d at 1120.  The clearly established inquiry is undertaken "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The court has discretion to address the two prongs of the qualified immunity analysis in whatever order "will best facilitate the fair and efficient disposition of each case" and may "determine that the right allegedly violated was not clearly established without deciding whether a constitutional violation occurred at all." *Pearson v. Callahan*, 555 U.S. 223, 242 (2009); *Maddox*, 727 F.3d at 1121.

### a.   Count I – § 1983 Illegal Seizure (Dorriety and Sanders Only)

### i.   The Undisputed Facts Establish Probable Cause

Count I alleges that Cpl. Dorriety and Officer Sanders seized Walker without reasonable suspicion or probable cause in violation of his Fourth and Fourteenth Amendment rights.[5]  Compl. (Doc. 1) ¶ 44.  Probable cause at the time of arrest absolutely bars any subsequent § 1983 claim for false arrest.  *Quire v. Miramar Police Dep't*, 595 F. App'x 883, 886 (11th Cir. 2014); *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010).  "Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed."[6]  *Id.*

---

[5] Walker's illegal seizure claim is properly analyzed under the Fourth, not Fourteenth Amendment.  *Alcocer v. Mills*, 906 F.3d 944, 953 (11th Cir. 2018) (explaining that the Fourth Amendment governs claims for seizure without probable cause while the Fourteenth Amendment controls claims for continued detention after a right to release where probable cause supports initial seizure).

[6] Even if officers lack actual probable cause, they are still entitled to qualified immunity if they meet the lesser standard of arguable probable cause.  Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge could have believed that probable cause existed even though they were mistaken.  *Brown*, 608 F.3d at 734-735.

Determining whether arresting officers had probable cause at the time of arrest turns on the elements of the suspected crime and the facts within their collective knowledge. *Id.* at 734-735 (11th Cir. 2010); *Skop v. City of Atlanta*, 485 F.3d 1130, 1137-38 (11th Cir. 2007). Under Alabama law, "[a] person commits the crime of public intoxication if he appears in a public place under the influence of alcohol, narcotics or other drugs to the degree that he endangers himself or another person or property, or by boisterous and offensive conduct annoys another person in his vicinity." ALA. CODE § 13A-11-10(a) (1975). Public intoxication is designated as a violation punishable by not more than 30 days in the county jail and a fine not to exceed $200. ALA. CODE §§ 13A-5-7(b); 13A-5-12(b) (1975).

At the time of Walker's arrest, the arresting officers collectively knew sufficient facts to establish actual probable cause for public intoxication. The officers initially responded to an E-911 dispatch call for a suspicious mentally disturbed person who was causing a disturbance by yelling and putting voodoo curses on residents on a public street. (Docs. 49-4; 49-5) ¶ 5. As the officers responded, the dispatcher said that the 911 caller was following the subject in a pickup as he walked down the street, and that the subject was trying to crawl into the back of the pickup. (Docs. 49-4; 49-5) ¶ 6. Sergeant Owens arrived and saw the subject moving through the back yards of some homes and reported this over the radio. He also reported that the subject was very vocal. (Docs. 49-4; 49-5) ¶ 7.

14

When Cpl. Dorriety arrived at the fenced backyard where the subject was located, he recognized him as Walker and knew he had a drug problem from prior calls. (Doc. 49-5) ¶ 10. Walker was ranting nonsensically in a loud voice about God and being the second Messiah. (Doc. 49-4) ¶ 11. He also made statements about drugs and claimed that he had just shot five SWAT team members. (Doc. 49-4) ¶ 13. Walker refused multiple commands to come back over the fence, and when Cpl. Dorriety climbed over the fence and entered the yard, Walker came at him with a ladder. (Doc. 49-5) ¶ 13. After Walker was subdued, he continued to make nonsensical statements about drugs, being shot with high-powered rifles, and killing people including police officers. (Doc. 49-4) ¶¶ 27, 28, 34, 35, 37; (Doc. 49-5) ¶¶ 20.

Cpl. Niles interviewed the 911 caller who reported that he found Walker at his sister's home "raising hell," and that Walker cursed him and threatened to kill him. (Doc. 49-5) ¶ 25. Both Cpl. Dorriety and Officer Sanders believed that Walker was delusional because he was high on drugs. (Doc. 49-4) ¶ 29; (Doc 49-5) ¶ 22. These facts within the collective knowledge of the arresting officers are more than sufficient to cause a person of reasonable caution to believe that Walker had or was committing the crime of public intoxication either on the basis that his boisterous and offensive conduct was annoying others, or on the basis that he was a danger to himself or another person or property. *See* ALA. CODE § 13A-11-10(a) (1975).

### ii.     **Walker's Conviction Establishes Probable Cause.**

Walker's municipal court conviction further establishes probable cause.   The Eleventh Circuit instructs that "where the plaintiff was convicted of the offense for which []he was allegedly falsely arrested, that judgment of conviction 'conclusively establishes that the arrest was made with probable cause, absent a showing of fraud, perjury or corrupt means.'" *Quire*, 595 F. App'x at 886 (quoting *Howell v. Tanner*, 650 F.2d 610, 615 n. 6 (former 5th Cir. Unit B 1981[7])).   *See also Stephens v. DeGiovanni*, 852 F.3d 1298, 1318-1319 (11th Cir. 2017) (state-court *nolo contendere* plea conclusively establishes probable cause and forecloses § 1983 false arrest claim).   The records of the Ozark Municipal Court establish that Walker was arrested for public intoxication on January 7, 2019 and convicted of that charge on July 28, 2020.   *Ozark v. Walker*, MC20-12 (Ozark, Ala., Mun. Ct.). Walker appealed requesting trial de novo in the Circuit Court of Dale County.   *Id.*, Notice of Appeal.   However, he failed to appear for a docket call, and the circuit court dismissed his appeal and remanded to the lower court for disposition.   *Alabama v. Walker*, Case No. CC-2020-000181.00 (Dale County Cir. Ct.) (Docs. 53 & 55).   Whether Walker's municipal court conviction survives his appeal is a question of Alabama law.   *See DeGiovanni*, 852 F.3d at 1319.

In *Yancey v. Farmer*, 472 So. 2d 990, 992 (Ala. 1985) the Alabama Supreme Court explained that "[a]s a general rule a person's conviction in a criminal case is admissible

---

[7]Unit B. decisions of the former Fifth Circuit are binding precedent in the Eleventh Circuit.

against him in a civil action to show that he did the act for which he was convicted." However, when "the accused is entitled to a trial de novo in circuit court . . . the district court's judgment . . . is vacated by such an appeal and the district court conviction is not admissible to prove that the accused did the act he was accused of. *Id.*  In *Farmer*, the plaintiff's appeal was pending in circuit court at the time of the civil trial. *Id.* at 991.  Here, Walker's appeal has been dismissed and the criminal case remanded.   Under these circumstances, the undersigned concludes that Walker's municipal court conviction stands and is prima facie evidence of probable cause.  *See Woodruff v. City of Tuscaloosa*, 101 So. 3d 749, 753 (Ala. 2012) (municipal court conviction *nol prossed* on appeal in circuit court prior to trial de novo is prima facie evidence of probable cause).   A contrary conclusion would allow a cagey defendant to vacate a municipal court conviction by simply filing and then abandoning an appeal.  There is no evidence that fraud, perjury, or corrupt means were used to obtain Walker's public intoxication conviction in municipal court, and it further establishes that probable cause supported his arrest.[8]

### b.    <u>Count II – § 1983 Excessive Force (Dorriety and Sanders Only)</u>

Walker alleges that Cpl. Dorriety and Officer Sanders used excessive force when they arrested him.  Compl. (Doc. 1) ¶¶ 47-49.  "The use of excessive force in executing an arrest is a species of unreasonable seizure" prohibited by the Fourth Amendment.  *Hinson*,

---

[8] It also appears that Walker's § 1983 false arrest claim is barred by the Supreme Court's ruling in *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) because it would necessarily imply that his conviction for public intoxication is invalid.   However, Defendants have not raised this issue, and it is unclear whether this constitutes a waiver.  *See Teagan v. City of McDonough*, 949 F.3d 670, 678 (11th Cir. 2020).

927 F.3d at 1117.   Excessive force claims are governed by the Fourth Amendment's "objective reasonableness" standard.   *Id.*   Under this standard, a court must determine "whether a reasonable officer would believe that this level of force is necessary in the situation" confronting the officer.   *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (internal quotes and citation omitted).   This inquiry must be conducted on a case-by-case basis "'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"   *Hinson*, 927 F.3d at 1117 (quoting *Graham v. Conner*, 490 U.S. 386, 396 (1989)).   The Eleventh Circuit explains that "the amount of force used by an officer in seizing and arresting a suspect must be reasonably proportionate to the need for that force." *Hinson*, 927 F.3d at 1117 (quoting *DeGiovanni*, 852 F.3d at 1324). Some of the factors the court may consider in making this determination are (1) the severity of the crime, (2) whether the subject poses an immediate threat to the safety of the officers or others, (3) whether the subject actively resists or tries to evade arrest by flight, (4) the need for force to be applied, (5) the amount of force applied, and (6) the severity of any injury.   *Hinson*, 927 F.3d at 1117.

With respect to qualified immunity, the Supreme Court has emphasized that "use of excessive force is an area of the law in which the result depends on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the facts at issue."   *City of Escondido, Calif. v. Emmons*, __U.S.__, 139 S. Ct. 500, 503 (2019) (quoting *Kisela v. Hughes*, __U.S.__, 138 S. Ct. 1148, 1153 (2018)). The Court admonished that "it does not suffice for a court to simply state that an officer

may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness." *Id.* Rather, "an officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* The Eleventh Circuit explains that because the excessive force standard "establishes no bright line, qualified immunity applies unless application of the standard would inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." *Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993). Stated another way, "[a] law enforcement officer receives qualified immunity for use of force during an arrest if an objectively reasonable officer in the same situation *could have* believed the use of force was not excessive." *Brown*, 608 F.3d at 738 (emphasis added). This is a question of law for the court to decide. *Willingham*, 261 F.3d at 1184.

With these principles in mind, the undersigned turns to the specific facts concerning Walker's arrest here. First, it is undisputed that Officer Sanders was unable to climb over the fence and never entered the back yard. (Doc. 49-4) ¶ 19. He remained outside the fence and did not use any force against Walker. (Doc. 49-4) ¶ 23; (Doc. 49-5) ¶ 16. Personal liability for constitutional violations can only attach for an officer's own misconduct. Officers "are not liable under § 1983 for the unconstitutional acts of their subordinates [or fellow-officers] on the basis of respondeat superior or vicarious liability." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotes and citation omitted). Rather, a plaintiff must show "that each Government-official defendant, through

19

the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009). Therefore, because Officer Sanders did not use force against Walker, he is entitled to qualified immunity on Walker's excessive force claim.

With respect to the force used by Cpl. Dorriety, the Eleventh Circuit has "long and repeatedly recognized that when making a custodial arrest, some use of force is necessary and altogether lawful." *Huebner v. Bradshaw*, 935 F.3d 1183, 1191 (11th Cir. 2019) (internal quotes and citation omitted). The "use of force is an expected, necessary part of a law enforcement officer's task of subduing and securing individuals suspected of committing crimes[,]" and "'the *typical* arrest involves some force and injury.'" *Lee*, 284 F.3d at 1200 (quoting *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002)) (emphasis original). Therefore, the Eleventh Circuit "has established the principle that the application of *de minimis* force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000); *see also Alexander v. Ortiz*, 2019 WL 5076354, at *4 (11th Cir. 2019). Examples of *de minimis* force include an officer who "grabbed [the plaintiff] from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him," *Nolin*, 207 F.3d at 1255; an officer "arrest[ing] the plaintiff for a building code violation [who] pushed the plaintiff against a wall and applied a choke-hold before placing the plaintiff in handcuffs—all despite the fact that the plaintiff did not resist," *id.* at 1256; and an officer "grabb[ing] [the plaintiff] in a headlock around the neck

and pull[ing]" him to the ground even if he was not resisting, *Alexander*, 2019 WL 5076354, at *4.

Under the totality of the circumstances here, the amount of force used to arrest Walker was not disproportionate to the need for force.  When Cpl. Dorriety arrived on the scene, he recognized Walker from prior calls and knew he was a drug abuser and that the yard he was in was not his.  (Doc. 49-5) ¶ 10.  Walker was causing a loud disturbance, ranting nonsensically, and refusing police commands to come out of the fenced back yard. (Doc. 49-4) ¶¶ 11-17.  When Cpl. Dorriety climbed over the fence and entered the yard, Walker came at him holding a ladder that Cpl. Dorriety believed he intended to use as a weapon.   (Doc. 49-5) ¶ 13.  At this point, Cpl. Dorriety fired his TASER at Walker in probe mode.   (Doc. 49-5) ¶ 13.  Corporal Dorriety's use of his TASER was a reasonable and appropriate use of force that was proportionate to the threat posed by Walker.  *See Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (use of TASER during traffic stop to effect arrest of hostile, belligerent, and uncooperative subject did not constitute excessive force).

When only one probe from the TASER struck Walker and it failed to subdue him, Cpl. Dorriety told Inv. Johnson to grab Walker from behind.  (Doc. 49-5) ¶ 14.  Investigator Johnson took Walker to the ground where he resisted handcuffing by tensing his arms under his body and kicking with his legs.  (Doc. 49-5) ¶ 15.  The officers then utilized common police tactics to immediately and decisively gain control.  Corporal Dorriety kneeled on Walker's left side, Cpl. Niles kneeled on his right side, and Inv. Cauthlen

kneeled at his head.  (Doc. 49-5) ¶ 15.  Sergeant Owens crossed Walker's legs and pressed his feet toward his buttocks to stop him from kicking.  (Doc. 49-5) ¶ 15.  Corporal Dorriety and Cpl. Niles quickly overpowered Walker's arms and brought his hands behind his back where Cpl. Dorriety handcuffed him.  (Doc. 49-5) ¶ 15.  Once Walker was handcuffed, all use of force against him stopped immediately.  (Doc. 49-5) ¶ 15.  The force used by Cpl. Dorriety here was *de minimis* force as defined by Eleventh Circuit precedent.  No gratuitous or malicious force was used against Walker after he was subdued.  Corporal Dorriety and the other officers used only the force necessary to rapidly gain control of Walker and secure him.  Accordingly, because not every reasonable police officer in Defendants' position would have inevitably concluded that the force used here was unlawful, Cpl. Dorriety and Officer Sanders are entitled to qualified immunity on Walker's excessive force claims.

### c.      **Count V – § 1983 Deliberate Indifference (All Defendants)**

Count V is a deliberate indifference to serious medical needs claim brought against all five Defendants.  Compl. (Doc. 1) ¶¶ 56-57.  The Fourteenth Amendment governs deliberate indifference claims by pretrial detainees while the Eighth Amendment governs prisoner's deliberate indifference claims.  *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).  The standards for both are identical.  *Id.*

To prevail on a deliberate indifference claim, a plaintiff must establish (1) an objective component, (2) a subjective component, and (3) causation.  *Id.*  The objective component requires a plaintiff to show that he had a serious medical need.  A medical need is serious enough to satisfy this component if it has been diagnosed by a physician as

mandating treatment or "'is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). Although Walker's complaint alleges that he suffered a broken leg (Doc. 1) ¶ 24, he has presented no evidence concerning this alleged injury at the summary judgment stage. Accordingly, he has failed to establish the objective component of his deliberate indifference claim.

Next, the subjective component requires a plaintiff to show that the officers acted with deliberate indifference to his serious medical needs. To do this, a "'plaintiff must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence.'" *Goebert*, 510 F.3d at 1327 (quoting *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005)). Whether an officer had subjective knowledge of a risk of serious harm and whether he consciously disregarded that risk are both fact questions. *Goebert*, 510 F.3d at 1327.

Here, the undisputed summary judgment record shows that Cpl. Dorriety called for an ambulance as soon as Walker was in custody. (Doc. 49-5) ¶ 17. Walker claimed that his leg was injured, but there was no bleeding or deformity visible on his leg. (Doc. 49-4) ¶ 25; (Docs. 49-5, 49-6, 49-7, 49-8) ¶ 18. None of the officers believed that Walker was injured. (Doc. 49-4) ¶ 29; (Doc. 49-5) ¶¶ 18, 22; (Doc. 49-6) ¶¶ 18, 23; (Doc. 49-7) ¶¶ 18, 21 (Doc. 49-8) ¶¶ 18, 22. Rather, they thought that he was delusional because he was high on drugs. *Id.* The medics arrived and evaluated Walker. (Doc. 49-5) ¶ 22. When the medics completed their examination, they cleared him for transport to jail. They did not

23

inform the police that he was injured or required hospital care.  (Doc. 49-5) ¶ 22.  Corporal
Sanders booked Walker into the Dale County Jail where the officers believed he would
have access to medical care.  (Doc. 49-4) ¶ 29.  There is no evidence that any Defendant
had a subjective belief that Walker was seriously injured.  Given these undisputed facts,
Walker cannot establish the subjective or objective components of his deliberate
indifference claim, and Defendants are entitled to summary judgment on Count V.

### B.   State Law Claims

Having disposed of Walker's § 1983 constitutional tort claims, the undersigned now
turns to his state-law claims under the Court's supplemental jurisdiction.  28 U.S.C. § 1367.
Walker brings claims under Alabama law against Cpl. Dorriety and Officer Sanders for
false arrest/false imprisonment and assault and battery/excessive force.  Compl. (Doc. 1)
Counts III & IV ¶¶ 50-52; 53-55.  The undersigned's analysis of these claims is guided by
the Eleventh Circuit's opinion in *Brown*, 608 F.3d at 740-743.

Alabama law enforcement officers are immune from civil liability for "exercising
judgment in the enforcement of the criminal laws of the State including, but not limited to,
. . . arresting or attempting to arrest persons[.]"  *Ex parte Cranman*, 792 So. 2d 392, 405
(Ala. 2000).[9]  This immunity is forfeited only if the officer "acts willfully, maliciously,
fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the

---

[9] Alabama law enforcement officer immunity has two sources: the restatement of the rule governing state-agent immunity articulated by the Alabama Supreme Court in *Cranman*, 792 So. 2d at 405; and ALA. CODE § 6-5-338 (1975).  The *Cranman* test governs application of the immunity from either source, and they are identical for purposes of this case.  *See Brown*, 608 F.3d at 741; *Hollis v. City of Brighton*, 950 So. 2d 300, 308 (Ala. 2006).

law," or when required by the constitution or laws of the United States or Alabama.  *Id.* As with qualified immunity, the defendant officer bears the initial burden of showing that he was performing a function that would entitle him to state-agent immunity.  *Ex parte Estate of Reynold*, 946 So. 2d 450, 452 (Ala. 2006).  Once he does so, the burden shifts to the plaintiff to overcome that immunity.  *Id.*

Here, there is no question that the Ozark Police officer Defendants were exercising judgment in enforcing Alabama criminal law, and they are entitled to immunity.  Walker has the burden of overcoming their immunity by showing that they acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law.

Walker's state-law false arrest claim fails for the same reason as his analogous § 1983 false arrest claim.  Under Alabama law, the tort of false arrest requires proof that the defendant caused the plaintiff to be arrested without probable cause.  *Ex parte Harris*, 216 So. 3d 1201, 1213 (Ala. 2016).  The summary judgment record here establishes that Walker's arrest was supported by probable cause.  *See* § A.1.a.i *supra*.

The same goes for Walker's assault and battery/excessive force claim.  Alabama law permits a person authorized to detain another to use appropriate force to effect the detention.  *See Kmart Corp. v. Perdue*, 708 So. 2d 106, 110 (Ala. 1997) (no assault and battery occurred where store employee used appropriate force to detain suspected shoplifter as authorized by Alabama statute).  The Alabama Code authorizes police officers to make warrantless arrests "[i]f a public offense has been committed or a breach of the peace

25

threatened in the presence of the officer."   ALA. CODE § 15-10-3(a)(1) (1975).   The undersigned has already determined that the undisputed record here shows that the force the officers used was objectively reasonable and not excessive.   *See* § A.1.b *supra*.

Walker has adduced no evidence showing that Cpl. Dorriety and Officer Sanders acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law when arresting him.   He has therefore failed to overcome their state-agent immunity on his state-law claims.

## V.   CONCLUSION

For the reasons stated above, it is the

RECOMMENDATION of the Magistrate Judge that Defendants' Motion for Summary Judgment (Doc. 48) be GRANTED, and that JUDGMENT be entered in FAVOR OF DEFENDANTS on all claims.   It is further

ORDERED that the parties shall file any objections to this Recommendation **on or before February 13, 2023**.   A party must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered.   Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of

plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11TH

CIR. R. 3-1.  *See Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also*

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

      DONE this 30th day of January, 2023.

_____

Stephen M. Doyle
CHIEF U.S. MAGISTRATE JUDGE